**PAYNE, Agent, v. HILL et al. (No. 6406.)**

(Court of Civil Appeals of Texas. Austin. Rehearing Denied June 7, 1922.)

**1. Railroads &#8701;348(1)—Finding of negligence as to pedestrian killed by cars held against weight of testimony.**

In an action for a pedestrian's death, caused by negligence in moving cars over a public crossing without signal and lookout, a verdict for plaintiff *held* contrary to the great preponderance and overwhelming weight of the testimony.

**2. Appeal and error &#8701;1058(2)—Exclusion of certain testimony was harmless error, where afterwards admitted.**

Error in excluding certain testimony was harmless, where afterwards such witness was permitted to testify to substantially the same facts.

**3. Evidence &#8701;477(3)—Nonexpert witness, who had made examination of injured person, may give opinion as to effect of injury on ability to run.**

In an action against a railroad company for wrongful death, where a witness for plaintiff testified that plaintiff's intestate after the injury ran a given distance, evidence of a nurse, a nonexpert witness, who had made some examination of decedent after his injury, was competent to render an opinion that decedent could not have run that distance after the injury.

Appeal from District Court, McLennan County; Erwin J. Clark, Judge.

Suit by Mrs. Alda Hill and others against Walker D. Hines, who was afterwards succeeded by John Barton Payne, as Agent, in charge of the Gulf, Colorado & Santa Fé Railroad for damages for the death of named plaintiff's husband, G. E. Hill. Judgment for plaintiff against the defendant Agent, and he appeals. Reversed and remanded.

Terry, Cavin & Mills, of Galveston, and Sanford & Harris, of Waco, for appellant.

Tom M. Hamilton and J. A. Kibler, both of Waco, for appellees.

KEY, C. J. Mrs. Alda Hill brought this suit against Walker D. Hines, who was afterwards succeeded by John Barton Payne, as Director General, and the Gulf, Colorado & Santa Fé Railroad, for the purpose of recovering damages on account of the death of G. E. (or E. E.) Hill, on August 9, 1919. J. D. Hill and M. E. Hill were also made parties to the suit. Mrs. Alda Hill alleged that she was the surviving wife of G. E. Hill, and that J. D. Hill and his wife, Mrs. M. E. Hill, were the father and mother, respectively, of G. E. Hill.

For cause of action appellees alleged that on the 7th day of August, 1919, between the hours of 4 and 6 o'clock p. m., while the said G. E. Hill was traveling along and over one of the public streets of the city of Cleburne, adjacent to the freight depot, and while he was in the act of crossing one of the tracks, where the same intersects the public street, the agents, servants, and employés of the defendant railway company suddenly and without warning, and without any alarm or signal whatever, and without having a brakeman or other person at the crossing to warn the said Hill of the danger, started a string of cars in motion across the public street, over the track on which the said deceased Hill was crossing; that at the time said string of cars was started it was standing with the end car thereof just about even with the line of the street, and with the portion of the street commonly and habitually used by pedestrians as a walkway; that, as said cars were suddenly put in motion, the end car struck the deceased with great force, throwing and hurling him to the ground, knocking the deceased onto the track, and that the car passed partially over him, dragging, crushing, and injuring him, to such an extent that he died from his injuries on the 9th of August, 1919.

As acts of negligence, appellees alleged that appellant was negligent (a) in suddenly starting said string of cars over said public crossing without giving any alarm or signal with the bell or whistle of the engine moving the same; (b) in failing to have a brakeman or other employé at the crossing or upon the string of cars, to warn the deceased and all other persons using the same of the danger, prior to moving said string of cars over said crossing in the manner aforesaid; that said acts of negligence, separately and collectively, were the proximate cause of the injury to and death of the deceased, as hereinbefore set out.

Appellant answered by special exception, general demurrer, and general denial, and specially answered: That if said Hill was injured as alleged, then at the time of the injury he was a trespasser, in this: That he was in the yards of appellant, and among its tracks, away from any public thoroughfare, street, or passageway; that said property was duly posted, warning the deceased and other persons from going upon or being on said property.

Appellant further specially answered that, if the deceased was injured, his injuries were the direct and proximate result of his own negligence, in this: That, notwithstanding the warning posted on the property, he went upon the same and down among the tracks, trains, and cars standing on said tracks, and away from any public thoroughfare, street, or passageway over said tracks, and laid down under one of the box cars standing on one of the tracks, and went to sleep, and that but for such negligence the deceased would not have been injured.

&#8701;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The case was tried to a jury, submitted on a general charge, and resulted in a general verdict in favor of appellee Alda Hill in the sum of $12,000, and in favor of appellees J. D. Hill and M. E. Hill in the sum of $500. The trial court sustained a plea in abatement presented by the railroad company, and rendered judgment against the defendant Payne, as Director General of Railroads, for the amounts awarded by the verdict of the jury, and the latter has appealed.

The undisputed testimony shows: That the deceased, Hill, received the injuries from which he subsequently died between the hours of 3:30 and 4:30, on the afternoon of August 7, 1919; that he was carried to a sanitarium in Cleburne, reaching that institution at 4:30 on the afternoon of August 7, 1919; that he died about 3 o'clock a. m., August 9, 1919; that the deceased, when found, was lying on the ground with his head a short distance from the end of the ties on what is known as the new city spur in the city of Cleburne; that his feet were extended at right angles, or practically so, with the track; that his companion, Bob King, went to the office of the Cleburne Cotton Oil Mill, and requested those in the office to phone for a physician, which was done; that Bob King then went to the residence of Mrs. Arch Ferguson, and requested her to phone for an ambulance, which was done; that when the doctor, summoned by the people at the oil mill, and the ambulance driver, Ralph Benton, and the witnesses, Mrs. O'Dowd, Mrs. Timmins, and Mrs. Ferguson, reached the injured man, he was found in the position above indicated with reference to the new city spur track of the Gulf, Colorado & Santa Fé Railroad, the injured man having his coat and shoes off and lying by him; that the point at which he was found would, if Smith street had been extended east, have been in the middle of Smith street, and was 540 feet south of the nearest street crossing the track of the Gulf, Colorado & Santa Fé Railroad, this being the street immediately adjacent to the freight depot and platform; that from the end of Smith street to where deceased was found was something like 70 or 75 yards; that the point where deceased was found was between a string of cars on the new city spur track of the Gulf, Colorado & Santa Fé Railroad, and a string of cars on the main line of the Trinity & Brazos Valley Railroad; and the ambulance driver, in order to reach the place where the deceased was, had to drive down from Shaffer street, which was 540 feet north of this point, between these two strings of cars, for a considerable distance, before reaching the injured man.

[1] We sustain appellant's assignments of error which charge that the verdict of the jury is contrary to the great preponderance and overwhelming weight of the testimony. We copy from appellant's brief the following summary of the testimony, which is substantially correct:

"From a drawing, showing the location of the depot, ground, switches, etc., of the Gulf, Colorado & Santa Fé Railroad Company, introduced in evidence, copy of which follows page 73 of the statement of facts, it will be noted that the south end of the passenger depot is three blocks north of the south end of the freight platform, and that the freight depot is north of the freight platform; that no street crosses the track at the south end of the freight depot, but that Shaffer street crosses the tracks at the south end of the freight platform.

"The evidence shows that the first track west of the freight platform is the west house track of the Gulf, Colorado & Santa Fé; that the next track is the main line of the Trinity & Brazos Valley; that the only track of the Gulf, Colorado & Santa Fé west of the freight depot is the west house track, and that all other tracks of said railway are east of the depot; that the end of the new city spur, near which spur the injured man was found, is 240 feet south of the south line of Shaffer street, and that from the end of the new city spur to the place where the injured man was found is 310 feet; that it is 70 feet from the end of the freight platform to the point where the Trinity & Brazos Valley main line intersects the south line of Shaffer street.

"R. R. King, testifying by deposition, being the only witness for appellees on the facts of the injury, testified that he and the deceased reached Cleburne on the day of the accident, about 1 o'clock in the afternoon; after getting their lunch they went down to the Santa Fé passenger depot, and, finding that the train for Temple did not leave until between 4 and 5 o'clock, they remained at the passenger depot for a little while, and then walked down the track to the freight depot, trying to locate some people the deceased knew; that when they got to the corner of the freight depot an old man came along, and they were talking about the Old Settlers' Reunion, and that after this Hill started off to see whether he could find the people whom he knew, and who lived across the track; that he saw the accident, and saw the deceased when the train struck him in the side, knocking him down; that the deceased was crossing the track at the end of some box cars, when a switch engine bumped the cars, and he looked around and saw the drawhead on the end car strike the deceased on the side and knock him down; that after the deceased was struck by the string of cars he was under the cars, and when the cars pulled off of him the deceased got up by himself and ran about the length of two cars; that his clothing was torn from his heels up to his neck; that, when he got the length of two cars he fell, and the witness picked him up, and the deceased jerked loose and ran about the length of a car and a half, and fell, and lay there while the witness phoned for a doctor; that the deceased did not say a word; that he went to what he took to be the freight office, and told the gentleman over there to phone for a doctor, that a man had got hurt at the crossing; that he then went across the track to a residence and phoned the city ambulance, and it came and

picked up the deceased and carried him to the sanitarium; that the place where the accident happened was just at the street crossing running north and south, he thought; that he did not know the name of the street; that the accident occurred about 70 feet from the freight depot, and down the track from the freight depot, and across the street from the freight depot; that he believed the direction was west; that there were about 15 cars in the string that struck the deceased; that the witness was waiting at the freight depot while the deceased went across to locate his friends; that, when he last fell, the witness could not get him up any more. The deceased never said a word, merely looked crazy at him, his face all bruised up, and that he just lay stretched out on his back; that the witness is a brother-in-law of appellee Alda Hill.

"Mrs. F. T. O'Dowd, witness for appellant, testified that she resided at 505 South Wilhite street, in Cleburne; that Wilhite street runs north and south, and Smith street runs east and west, and that she lived the second door from Smith street, going north on Wilhite street; that she lived west of the Santa Fé tracks and right of way; that there is an alley between her back yard and the Santa Fé properties; there is no street back of her back yard, or between it and the Santa Fé properties; that Smith street does not run across the Santa Fé tracks; that she knew of the injury to the deceased; that it was something like 3 or 4 o'clock when she learned that a man had been hurt, and that she went out to where the injured person was; that she went out through her back yard, onto Smith street, and then went in an easterly direction; that Smith street does not extend any further east than Mrs. Ferguson's residence; that when she got to Smith street she went right on out towards the railroad tracks, and that if Smith street had been continued she would have gone right out Smith street; that, when she got to the railroad track, she found a string of box cars, and that she crawled under the cars and found Dr. Osborne out there, who had just given the deceased a hypodermic; that the ambulance was there, and one or two other men, besides Dr. Osborne and Mrs. Ferguson, and that there were some children there; that when she got there the deceased had been placed in the ambulance; the deceased's coat and shoes were lying out on the right of way; that the nearest street crossing north of where she found the injured man is Shaffer street, and that it is approximately from 450 feet to 600 feet north, because it is two full blocks, and that the depot platform, the freight house, is on the north side of Shaffer street; that the nearest street south from where the injured man was found was between 600 feet to 800 feet; that the cars under which she crawled to reach the injured man were on the spur track; that the injured man was on the east side of the box cars; that the spur track extended 200 feet to 250 feet north of where the injured man was; that the first track immediately east of where the injured man was is the Trinity & Brazos Valley main road; that the coat and shoes of the deceased were lying on the ground near the ties, about 3 or 4 feet from the end of the ties; that the ambulance, when she crawled under the box cars, was standing in about what would have been the middle of Smith street, if it had been extended across the track.

"Mrs. Arch Ferguson, witness for appellant, testified that she lived on Smith street, facing north, Smith street running east and west, in the city of Cleburne; that Smith street stops at her house, and the Santa Fé property is east of her place; that the first track is about 75 yards beyond her home; that this is a spur track, built for the paving company, off of the main line; that the next track to the spur track is the Trinity & Brazos Valley main line; that Smith street does not cross the railroad track, and that the nearest street north of Smith street, that crosses the tracks, is Shaffer street, approximately two blocks from Smith street; that the first she knew of the accident was when a young man came to her home and requested her to telephone for an ambulance, saying, 'I have a friend hurt by the cars out here;' that she later learned that this man's name was Bob King, and the injured man was Hill; that the man King indicated to her where the young man was who was hurt; that after telephoning for the ambulance she started to the front door to go to where the injured man was, and that at that time Dr. Osborne drove up, and she directed him to where the injured man was; Dr. Osborne left his auto standing in front of her house, and walked out to where the injured man was, and that, seeing the ambulance coming, she waited and told the ambulance driver how to get to where the injured man was; that he would have to go back up to Shaffer street and come down between the spur track and the main line of the Trinity & Brazos Valley; that she then got some ice water, some ice in a bowl, and some handkerchiefs, and went out to where the injured man lay; that she went due east from her house, crawling under the cars where the injured man was, and bathed his face and his eyes; that the injured man was east of the spur track, lying under a car, right at the edge of the track; that Dr. Osborne and the man King, who requested her to telephone for the ambulance, were there when she got there; that when she got there the injured man was lying on the ground; that she helped to put him in the ambulance; that the shoes and coat of the injured man were lying on the ground, 3 or 4 feet north of him; that this was between 3:30 and 4 o'clock; that, if Smith street had been extended across the tracks, the injured man, when she got to him, would have been in Smith street; that, when she got to the injured man, his head was about 1½ or 2 feet from the end of the ties, and his feet were out further from the track; that his body was lying at about right angles with the track; that the coat and shoes of the deceased were nearer his head than his feet.

"Ralph Benton, witness for appellant, testified by deposition that he was an undertaker, and lived in Cleburne at the time of the injury to the deceased; that he first knew of the accident when Mrs. Arch Ferguson phoned to him; that he drove the ambulance to Mrs. Ferguson's house, and she then directed him to the place where the injured man was lying; that from Mrs. Ferguson's house on Smith street he cut across some vacant property in a northeasterly direction, to Shaffer street, and then drove down between the main line of the

Trinity & Brazos Valley and a spur track, just west of the main line of the Trinity & Brazos Valley, to a point where Smith street should cross the tracks, but did not; that he found the man lying at the point where Smith street would have crossed the track if it had been extended; that the man was about two blocks south of the platform of the freight depot of the Gulf, Colorado & Santa Fé Railway Company; that the nearest street crossing to where he found the man was two blocks north, which was Shaffer street; that the man was lying close to the spur track, about midway of a box car on the spur track; that there was a string of box cars on the spur track, and also on the main line of the Trinity & Brazos Valley; that he carried the injured man to the Cleburne Sanitarium.

"S. H. Johnson, testifying as a witness for appellant by deposition, testified that he was bookkeeper in August, 1919, for the Cleburne Oil Mill; that he remembered the occasion of a man coming to the office and requesting him to call a doctor; that the man came into the office and stated that a man had been injured over by a box car, pointing out a certain box car, which was in a southeasterly direction from his office; that he pointed out a particular car, and said the man who was injured was near it; that after the man asked him to phone for a doctor he went back to where he said the injured man lay, and that a little later he came back the second time and asked if he phoned for a doctor, that the party was badly injured and needed a doctor right away; that Dr. J. D. Osborne came to his office, and he pointed out to Dr. Osborne about where the injured man was, from the direction given him by the man asking him to phone for a doctor; that his office is southeast of the freight depot and platform.

"Dr. J. D. Osborne, testifying as a witness in behalf of appellant, testified that he was a practicing physician, residing in Cleburne, Tex.; had been practicing 45 years; that he was president of the State Board of Medical Examiners at one time, and also at one time president of the State Medical Association; that he was called from the Cleburne Cotton Oil Mill on August 7th, to come there to treat a man who had been badly hurt on the railroad; that he went to the oil mill, and was there directed to where the injured man lay, the oil mill being west of the place where he found the injured man; that he turned back to what is called Shaffer street, turned down Shaffer street to Wilhite, down Wilhite two blocks, and turned and stopped his auto in front of Mrs. Ferguson's house, on Smith street; that from Mrs. Ferguson's house he went due east 75 or 80 yards; that he crawled under a string of box cars and found a man there, who said his name was Hill, and another man, who was with him, by the name of King; that Hill was the injured man; that, if Smith street had been extended, the injured man would have been right about the middle of Smith street; that the injured man was lying close to the railroad track, in the shade of a box car, his head west and his feet east; that he was suffering a great deal; that he gave him a hypodermic of morphine and strychnine; that he then put the injured man in an ambulance and sent him to the sanitarium; that the injured man

242 S.W.—20

had his coat and shoes off. On cross-examination, this witness testified that the injured man's head was about 2 feet west of the end of the railroad ties, and that his body was lying practically at right angles with the track, with his coat and shoes on the left-hand side of his body. The record shows that a box car varies in length from 32 feet to 40 feet.

"Ralph Benton, testifying by deposition in behalf of appellant, testified that the injured man was found west of the main line of the Trinity & Brazos Valley Railroad, and between the main line of the Trinity & Brazos Valley and the spur track; that he heard King, who was with the injured man, 'telling parties who had gathered about the injured man at the place of the accident how the accident occurred. The injured man was lying there at the time that King was relating the circumstances. King said that Hill was lying on the ground asleep by a box car, or near a box car, and that a switch engine bumped into the string of cars, and, when the car Hill was lying close to moved up, the journal caught and doubled him up.'

"As pointed out above, the witness S. H. Johnson testified that, when King came to his office to get him to phone for a physician, King pointed out the box car under which the injured man was lying, which was in a southeasterly direction from his office, and that his office was southeast from the freight depot.

"Dr. J. D. Osborne, who rendered first aid to the injured man, testified that he talked with Hill after he got to him, and until he was put in the ambulance; that while he was on the ground, and before he was put in the ambulance, Hill made a statement to him with reference to how the accident happened. Hill said that they were up town, and it was very hot, and they came down there to be in the shade and to get a rest, and that he (Hill) laid down near the track and must have fallen asleep, for the next thing he knew he was hurt. Dr. Osborne further testified that King was present when Hill made this statement, and that he thought that King told about the same thing; that both Hill and King told about being in Kansas and the harvest fields, and drifting back to Fort Worth, and then to Ranger, and from Ranger to Cleburne, and that King said that it was very hot up town, and they went down there to be in the shade and rest, and that Hill said he must have fallen asleep, because, Hill said, 'I do not remember anything until I woke up in great pain.'

"Mrs. R. L. Harris, testifying in behalf of appellant, testified that she lived in Cleburne; that she and her husband, Dr. Harris, owned the hospital in Cleburne; that she was a part owner, matron, and assistant business manager of the sanitarium; that the deceased, Hill, was brought to the sanitarium, according to her record, about 4:30 o'clock on the afternoon of August 7, 1919; that she saw the deceased, Hill, when he was first brought to the sanitarium, and that she was present when the doctors came to minister to him, and that she was present throughout most of the examination; that she heard Mr. Hill make a statement while in the hospital, as to how the accident happened; that the first statement was made after the doctors came, and that Dr. Dennis asked how it happened, and Hill said 'that he

was up on the square in the afternoon, and that he was hot and tired, and he said that we went down to the depot, and thought he would go down the tracks, and sit in the shade of a box car, and wait for the train to Temple. The train went to Temple at 10:25 o'clock that night. He also said that he supposed he must have fallen asleep by the box car there, because the first thing he remembered afterwards was that he was being jerked down the track all doubled up and hurt.' * * * That subsequent to the statement made in response to the question asked by Dr. Dennis, after the doctors had gone, and while the witness and one of the nurses was present, the injured man repeated the statement as to how the accident happened. This witness further testified that the witness King, while at the sanitarium, said, 'I did not see it' (meaning the accident).

"Miss Lily Hodges, testifying by deposition in behalf of appellant, testified that she was present when Mr. Hill was brought to the sanitarium; that 'Mr. Hill made a statement while at the sanitarium, in my presence, as to how the accident occurred. He said that he sat down in the cool and shade of a box car and fell asleep. Mrs. R. L. Harris was in the room at the time he made the above statement, and am pretty sure that Mr. Hill's mother was in the room also.'

"Dr. M. Dennis, testifying in behalf of appellant, testified that he had been practicing medicine since 1887; that he had resided in Cleburne for 15 years, and was local surgeon for the Santa Fé at that place; that he went to the Cleburne Sanitarium with Dr. Osborne, to see Mr. Hill; that, while they were dressing and working with Mr. Hill, Hill told how the accident happened; that Hill said 'he went down and sat down in the shade of a box car, and said that he must have gone to sleep'; that Mrs. Harris and several nurses were present at the time this statement was made.

"Mrs. M. E. Hill, one of the plaintiffs, mother of the deceased, testifying as a witness in behalf of appellant, testified that she went to Cleburne, reaching there on the early morning train about 7 or 8 o'clock on the 8th of August, and that when she got there she saw her son, Ennis, and that she stayed with him until the night of the 8th, until just shortly before he died; that when she got there the injured man told her how it happened. 'He told me that he went out there in the shade of a box car and sat down or laid down—one, I don't know which—and he said, "Mother, I must have dropped off to sleep." ' On cross-examination this witness testified that the deceased told her it must have doubled him back, illustrating with her hands, and the injured man said, 'Mother, I thought it had killed me sure.' 'He said that it doubled him up.'

"J. D. Hill, one of the plaintiffs, testifying as a witness in behalf of appellant, testified that he was the father of Ennis Hill, and saw him in the sanitarium at Cleburne on the afternoon before he died in the morning about 3 o'clock. On cross-examination he testified: 'I asked Ennis how the accident happened, and he said, "Just hard luck." '

"The witness R. R. King, by deposition, testified that he was present after the accident, when Hill made a statement as to how he got hurt; that he made a statement something about lying down on the track or by the side of the track, and two or three other different ways he got hurt, telling a different way every time, and his talk was kind of daffy and crazy like. 'The nurse and some other people were present, but I do not know them. * * * He said something about going to sleep by some cars or by the track. He also told about being in an automobile wreck, and two or three other ways he got hurt, in his daffy talking way, and showed that he was not himself.'

"The witness King, as pointed out above, testified that the box car knocked Hill down and dragged him while Hill was crossing the track on Shaffer street, being the street adjoining the freight depot, and that after the box cars pulled off of him he got up and ran two car lengths and fell, and King helped him up and he jerked loose and ran a car length and a half further, and then lay there.

"Mrs. R. L. Harris testified that after the injured man had been placed in bed he could not move himself, and that when the doctors were examining him he could not move himself and that the doctors had to turn him. Mrs. Harris further testified that the injured man could move his hand but that he could not hold a glass of water or milk or anything of that kind; that all this had to be given him through tubes.

"Miss Hodges, the nurse, testified that Mr. Hill's back and chest were badly bruised, and that he was not able to move himself at any time after he reached the sanitarium; that he could not move his body; that Mr. Hill's back and chest were badly bruised and crushed; that she did not know whether Mr. Hill's back was broken or fractured, but that it was badly crushed; that he was never able to get on his feet after reaching the sanitarium; that she was present and observed the doctors while they were examining Mr. Hill in the sanitarium.

"Dr. J. D. Osborne testified that he examined Hill at the sanitarium and found the eighth rib on the right side broken and pressing inwardly on his lung; that his face on the right side was badly bruised; that he could not move his limb; that they turned him and examined his spine, and found the lumbar region badly bruised; that Hill could not move his legs at all and could not turn himself over; that from the symptoms he diagnosed the injury as fractured spine, and that in his opinion, from conditions and symptoms he discovered when he first saw Hill on the ground and after his examination at the sanitarium, that it would not be possible for Hill to have run 3½ car lengths; that he could not move his legs. On cross-examination, he testified that he diagnosed it as a fractured spine, from objective symptoms discovered, but that he did not twist Hill about to ascertain definitely whether the spine was fractured.

"On cross-examination, Dr. Osborne testified that he did not make as close an examination of Mr. Hill's back as he might have done, because he thought he was dying anyway; that the abrasion on his back was about the size of a dinner plate; that the superficial tissue was gone and the skin was rubbed off; the muscles were tense and exposed; that Mr. Hill was suffering, either from a fractured spine or a concussion of the spine; that he had never known a man to receive an injury in the back, such as

PAYNE v. HILL
(242 S.W.)

Mr. Hill received, and get up after receiving the injury.

"Dr. Dennis testified that the eighth rib on the right side was fractured, and that there was considerable abrasion on the small of the back; that Mr. Hill was suffering from a concussion, but that as to whether his back was broken or not he could not say; that the injured man could not move himself, other than to slide himself up and down a little, which was a muscular reaction in the shoulders; that in his opinion it would have been impossible for a man injured like Mr. Hill to have run as much as 3½ car lengths after he received his injuries; that the man suffering with his injuries, immediately after receiving the injuries, in his opinion, could not have gotten to his feet at all. On cross-examination, Dr. Dennis testified that he did not make as careful an examination of Mr. Hill's back, because he was in a dying condition and there was no use of hurting him; that he could not be positive whether his back was broken or not; that a very extended examination might prove critical, and that a thorough examination would have been useless; upon further cross-examination, Dr. Dennis testified that, 'if there were no fracture of Mr. Hill's spine, that concussion of the muscles would have prevented him from getting on his feet and walking without a fracture. * * * I tell this jury that immediately after receiving a blow on the muscles and tendons in the back, from examination I made of Mr. Hill some time after the blow was received, that I do not think it would have been possible for Mr. Hill to have gotten up on his feet and walked at all. I say that I would tell this jury that for certain, from the examination I made, and I will tell them in detail, in the absence of a fracture to the spine, just what would take place to prevent a man from getting on his feet again, and walking or running several car lengths. The injury to the muscles would have prevented that. It would be just the blow to the muscles that would prevent it. We have had case after case where a man was struck on the back and he would fall like he was shot, and when that happens he is not going to move either.' That from the meager examination he made of Mr. Hill's back he discovered such external evidences of a blow to the back that warrants him in stating that within two or three seconds after Mr. Hill received the blow he could not run or walk either; that the muscles in the back were contracted along the spinal column and on each side over an area of about 6 or 8 inches up and down the spinal column; and that another reason why he stated that Mr. Hill could not have walked after receiving the blow was because of the excessive pain Mr. Hill suffered when he was moved; also inability to use his limbs.

"Mrs. O'Dowd testified that, when she reached the place where Mr. Hill was, before being removed to the sanitarium, that Mr. Hill was perfectly conscious; that she heard him make several statements; that he told Mrs. Ferguson, who had wrapped a piece of ice in a handkerchief so that he could hold it to his mouth, 'Good lady, I can't hold it;' and that when it was discovered that Mr. Hill's coat and shoes were on the ground, and Dr. Osborne told them to throw them in the ambulance, Mr. Hill said, 'Leave them there; I don't want those; I have better ones than that at home.'

"Mrs. Arch Ferguson testified that, when she first saw Mr. Hill, he seemed to be perfectly conscious; seemed like he knew everything; that while she was bathing his face with ice water he looked up and said, 'Oh, good lady, how I hate for my dear old mother to know this;' that he told Mr. King to get his pocketbook to help bear his expenses, and that he told them just to leave his shoes and coat there; that he had better ones at home.

"Mrs. R. L. Harris, matron of the sanitarium, testified that Mr. Hill was conscious when he was brought to the sanitarium, and remained conscious until 1 or 2 o'clock on the next day, the 8th of August; that some time about 1 or 2 o'clock he seemed to wander in his mind; he talked at random at times, and then he would be perfectly rational.

"Miss Lily Hodges testified that Mr. Hill was conscious when he was first brought to the sanitarium, and that he continued conscious after reaching the sanitarium until about 2 o'clock the next day.

"Ralph Benton, the ambulance driver, testified that he had heard Mr. Hill, while he was lying on the ground, and before being removed to the sanitarium, request that his father, at Temple, be notified.

"Dr. Osborne testified that, when the witness first reached Mr. Hill, he was conscious; that Hill talked considerably, but, in addition to the statements already testified about, that Hill said, 'Doctor, I am suffering, and I want you to take care of me; I haven't much money, but my father will take care of me, and I want you to get my father. He is in Temple.' He told me his father's address and all, and was anxious to get his father there. Dr. Osborne testified further that he was conscious when he left the sanitarium; that he was back there the night of the 7th, about 8 o'clock, and that he was still conscious; that he saw him next morning at 9 o'clock, and he was conscious, and he went back that evening of the 8th and found Dr. Talley, of Temple, who was the family physician of Mr. Hill, and that Mr. Hill was conscious then; that this was between 6 and 8 o'clock, and that he died about 3 o'clock on the morning of the 9th.

"Dr. Dennis, who assisted Dr. Osborne in the examination of Mr. Hill at the sanitarium, testified that when he got to the sanitarium Mr. Hill was perfectly conscious; that he was conscious when he left there; that he saw him the next morning, about 9 or 10 o'clock, and that he was conscious at that time.

"Mrs. M. E. Hill, mother of the deceased, testified that when she reached the sanitarium, between 7 and 8 o'clock the morning of August 8th, Mr. Hill was conscious and knew everything; knew her, and spoke to her before she got into the room; that she remained with him until that night, until he got to the point where he did not know her, and that she left, and went back to his room just about the time he passed away; that it was some time after night when he became unconscious, and she left the room.

"J. D. Hill, the father of the deceased, testi-

fied that he reached Cleburne and the sanitarium, where his son was, some time late in the afternoon, and that he was conscious then; that the son knew him, and asked him a few questions; that he talked some, and would answer questions asked him by his father; that the injured man knew Dr. Talley, the family physician, who was with the witness.

"R. R. King testified that, after the deceased broke loose from him and ran the extra car length and a half, he just lay stretched out on his back; that he never said a word to him; that Hill's clothing was torn from his heels to his neck.

"Mrs. M. E. Hill testified: 'I got some of Ennis' clothing after his death, when we started home; we carried his hat, his shoes, his coat, and his clothes home with us. The coat was just as good as it could be. There wasn't a tear in it, or nothing in the world the matter with it. It was practically new, and was just like it was when he left home. We carried the coat home, and Ennis' brother wore it off, and wore it quite a good deal, and suppose it is at home now.

"C. T. Stephens, who lives at Mexia, Tex., testified that he had known Mrs. Hill practically all of her life; that he knew Bob King, Mrs. Hill's brother-in-law, and that he had known him about 14 years; that R. R. King had lived around Mexia nearly all his life; that he knew Bob King's reputation for truth and veracity in and around Mexia, and that it was bad; that he did not know where Bob King is now.

"W. C. Caldwell, another citizen of Mexia, Tex., testified that he had known Mrs. Hill and her people since 1902; that he also knew Bob King. having known him since 1907 or 1908; and that he knew his general reputation for truth and veracity in that community, and that it was bad.

"J. T. Miller, also a citizen of Mexia, testified that he had known Bob King ever since he (King) came to Mexia; that he was well acquainted with him; that King traded with him part of last year; that he knew Bob King's general reputation for truth and veracity in and around Mexia; that it is bad; that he did not know where Bob King was now.

"H. E. Everett, also a citizen of Mexia, testified that he had lived there 30 years; that he had known Mrs. Alda Hill 15 years and that he had known Bob King 10 or 15 years, and had known him very well during that time; that he knew King's general reputation for truth and veracity in the community in which he lived and that it was bad."

Appellant also introduced evidence given by some of the yard crew:

"I. McDaniel, testifying for appellant, testified that he was a switching engineer in the employ of the Gulf, Colorado & Santa Fe; that on August 7, 1919, he was operating a switch engine in the wards at Cleburne; that he started to work at 8 o'clock and quit at 4, and that about 20 or 30 minutes before quitting he shoved four bad cars in on the city spur track; that he knew nothing about the accident, except what he read in the papers the next morning. On cross-examination, this witness testified that he remembered the last movement made by this crew on August 7th, by reason of the fact that on the next morning he read in the paper that the accident had happened in that part of the yards; that he could not be positive whether his crew was on the east or west house track on the afternoon of August 7th, though he did not think it was 'because those tracks were set up for the house, * * * and while the men are there working through the day we do not disturb those tracks as a rule'; that, while he would not be positive that his crew was not on either of those tracks that afternoon, to the best of his knowledge it was not; that these tracks were called the east and west house tracks; that cars to be loaded and unloaded are placed on these tracks when the men are not at work, so as not to interfere with the men loading and unloading the cars. On further cross-examination, he testified, 'To the best of my recollection this special crew that I was on was not in on the east or west house track on the afternoon of August 7, 1919, but, of course, I could not be absolutely positive;' that his attention was called to the fact that he made this move on the afternoon of August 7th by reading in the paper the next day about the accident, and that he saw that he was down in that part of the yard at the time the accident was supposed to have happened.

"H. J. Leonard, testifying in behalf of appellant, testified that he was engine foreman in charge of the switching crew operating in the south passenger yard August 7, 1919; that between 3 and 4 o'clock on the afternoon of August 7th there was no other switching crew working in the south yard, or in that part of the yard, at all; that the last thing he did on that afternoon was to take four bad order cars from the transfer track and place them on the city spur track; that between 3 and 4 o'clock on the afternoon of August 7, 1919, his switching crew was not in on the west house track; that the yard in which they were working when they got the four bad order cars, and about which he was testifying, is not the main switching yard at Cleburne; the main switching yards are further north, starting at the Y. M. C. A. and extending north 10 or 12 blocks, and that the Y. M. C. A. is about 5 blocks north of the freight platform. On cross-examination, after identifying the freight tracks as shown by plat, as follows: First track east of the platform being the east house track, and the next east the transfer track, and the next the team track or city track—witness testified that his crew was not on any of those tracks, except the transfer track, on the afternoon of August 7.

"J. F. Allen, testifying in behalf of appellant, testified that he was a switchman, employed in the crew of which Leonard was foreman; that they were down in the passenger yard around the freight depot on the afternoon of August 7th, and that the last move they made was between 3:30 and 4 o'clock, when they took some cars out of the transfer track and put them on the new city spur track, and that there were no other switching crews down in that yard, where his crew was working, at the time his crew was there; that he thought that the only move they made was to drag the bad order cars off of the transfer, and that they were not on any of the other tracks that afternoon.

"The witness Rothmael, testifying as a witness in behalf of appellant, testified that he was a switchman working on the crew of which Leonard was foreman in August, 1919, and that he was with the crew when the four bad order cars were placed on the new city spur on the afternoon of August 7th; that this was done between 3:30 and 3:45 in the afternoon; that on the afternoon of August 7th, when the bad order cars were moved, there was no other switching crew in that part of the yard. On cross-examination, he testified that he had never known of any other crew being in that part of the yard while his crew was on duty, and that the tracks indicated on the plat are neither the north or the south yards, but are in what is known as the passenger yard. On further cross-examination, this witness testified: 'I know there wasn't any crew down there from about 3 o'clock until 4 o'clock; I know that to be a fact; that his crew was down about the house somewhere at 3 o'clock.'"

It was alleged in plaintiffs' petition that G. E. Hill sustained the injuries which caused his death while he was crossing the railroad track, in a public street, and that his injuries were caused by the negligence of the employés of the Gulf, Colorado & Santa Fé Railroad, in causing a string of cars to cross that street without giving the deceased any warning. The burden rested upon the plaintiffs to submit proof which would support those allegations in the petition, and in order to accomplish that result they put before the jury the evidence of the witness R. R. King. King did not appear in person, but testified by written deposition. The plaintiffs offered no testimony other than that given by the witness King to sustain the material allegations above referred to. If G. E. Hill was injured at another and different place, which was not a public street or crossing, and though he may have been injured by an engine or cars on the Gulf, Colorado & Santa Fé Railroad, nevertheless, if the testimony fails to show any negligence upon the part of those operating such engine or train, the plaintiffs are not entitled to recover.

After careful consideration, we have reached the conclusion that the testimony given by the plaintiffs' witness R. R. King is not only contrary to the overwhelming weight of the testimony given by the other witnesses, many of whom were either disinterested, or, like the deceased's father and mother, were interested on the other side of the case, but that it was inconsistent with certain well-established facts. For instance, the well-established fact that the deceased's coat and shoes were found on the ground at the place where the two physicians and other witnesses found him is inconsistent with the evidence of the witness King to the effect that, after deceased was injured, he ran from the street crossing, where King says the injury occurred, 540 feet to the place referred to, fell down, and apparently seemed unable to get up, and yet, in a very short time, when the other people arrived, it was found that both his coat and shoes had been taken off. If it be conceded that he did not have his coat on when he started across the railroad track, for the purpose of attempting to find the people he formerly knew, there is no probability that he was then barefooted, and was carrying both his coat and shoes, and that he held on to them and carried them with him from the place where he was injured to the place where he was found by those who rendered him first aid. The testimony indicates that he was not in a condition to have removed his coat and shoes after he fell down the second time, even if one suffering as he was would have attempted to do so. It is much more reasonable to suppose that the deceased pulled off his coat and shoes at the place where they were found, before he was injured, and that theory is in harmony with the evidence given by his mother and several other witnesses, to the effect that he stated that he sat down in the shade of the car to rest, and must have gone to sleep.

Mr. King also testified that, when deceased first got up and ran two car lengths before falling down the first time, he noticed that his clothing was torn from his heels to his neck. But his mother testified that his coat was not damaged at all. If Mr. King told the truth about the condition of the clothing immediately after deceased was injured, and Mrs. Hill also told the truth about the condition of his coat, it is not probable that he had his coat on at the time he was injured, which tends strongly to support the theory that he had pulled off his coat, as well as his shoes, before he was injured.

It appears from the record that the case has been tried four different times, all except the last one resulting in hung juries. That circumstance may not be of any probative force, and does not influence this court, although it may indicate the weakness of the plaintiffs' case. At any rate, while this court is not lacking in respect for the verdict of a jury, it feels that it cannot escape the responsibility which rests upon it not to permit a verdict to stand which has no better foundation than that which is disclosed by the record in this case.

[2] We are also of the opinion that the trial court committed error, as pointed out in the first assignment of error, when it excluded certain testimony of Mrs. Arch Ferguson; but, as she afterwards testified to substantially the same facts, that error was harmless.

[3] Also we sustain appellant's second and third assignments, which complain of the action of the court in sustaining objections and in not permitting the witness Miss Lily Hodges to state as a witness that, in her opinion, taking into consideration the nature

of his injuries when he reached the sanitarium, the deceased could not have run 3½ car lengths; also the witness would have stated, as her opinion, that he could not move at all after he reached the sanitarium. The court excluded that evidence, which was objected to as constituting the opinion of a nonexpert witness. She testified:

That she was a nurse at the sanitarium at Cleburne; that she remembered Mr. Hill, the injured man, being brought to the sanitarium on the day of the accident; that she first saw him about 4:30 p. m. on the day of the accident; that she did not make a thorough examination of Mr. Hill's body, other than to ascertain that his back and chest were badly bruised; that Mr. Hill was unable at any time after reaching the sanitarium to move his body.

In response to cross-interrogatory propounded by appellees and offered by appellant, this witness testified:

"I do not know whether it [back] was broken or fractured, or either. I know that it was badly crushed. Mr. Hill was never able to get on his feet after reaching the sanitarium." That she was present while the doctors were making an examination of Mr. Hill's back, and that she observed the examination made by the physicians.

Testifying as to the extent of the injury to Mr. Hill's back, this witness testified that the back and chest were badly bruised and crushed. Counsel for appellant submit the following proposition:

"A nonexpert witness, who has made an examination of an injured person, may give an opinion as to the effects of the injury on the injured person, for the reason that a mere description, without the witness' opinion, would convey an imperfect idea of the thing described."

We sustain that proposition, and in support of our ruling cite the following authorities: Railway Co. v. Hepner, 83 Tex. 136, 18 S. W. 441; Railway Co. v. Smith (Tex. Civ. App.) 90 S. W. 926; Railway Co. v. Boyer, 44 Tex. Civ. App. 311, 97 S. W. 1070; Railway Co. v. Flory, 45 Tex. Civ. App. 233, 100 S. W. 200; Railway Co. v. Sandlin, 57 Tex. Civ. App. 151, 122 S. W. 60; Railway Co. v. Farris (Tex. Civ. App.) 124 S. W. 497; Railway Co. v. Morrison (Tex. Civ. App.) 129 S. W. 1159; Guerra v. San Antonio, etc., Pipe Co. (Tex. Civ. App.) 163 S. W. 669; Railway Co. v. Harling (Tex. Civ. App.) 208 S. W. 207.

In the Smith Case, supra, the Court of Civil Appeals for the Fifth District, in an opinion by Mr. Justice Talbot, held that the testimony of a nonexpert witness, that "plaintiff does not appear to be 50 per cent. as good a man now as he was before the injury," was not open to the objection that it is immaterial and irrelevant, and the opinion of a witness, not shown to be an expert on a matter, given in expert form, saying:

"The rule laid down by the text-writers, and which seems to have been followed in this state, is that nonexpert witnesses may give their opinions on questions of identity, resemblance, age, apparent condition of the body or mind, intoxication, insanity, sickness, health, etc. Such testimony is received in the particular cases or instances mentioned, because a mere description, without the witness' opinion, could 'convey an imperfect idea of the force, meaning, and inherent character of the things described.'"

The other cases cited are to the same effect.

Other assignments, which complain of the court's charge and of the refusal of charges, are not regarded as well taken, and are overruled.

For the error pointed out, the judgment is reversed, and the cause remanded.

Reversed and remanded.